UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JULIA EGAN, | ) | |
| | ) | |
| Plaintiff, | ) | 12 C 9034 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| HUNTINGTON COPPER MOODY & MAGUIRE, | ) | |
| INC., HCMM, INC., PATRICK MAGUIRE, DAVID | ) | |
| PINEDA, ROBERT POPKEY, WILLIAM | ) | |
| SHAPCOTT, JOHN MORRIS, and HUNTINGTON | ) | |
| COPPER, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

### Memorandum Opinion and Order

Julia Egan brought this suit against Huntington Copper Moody & Maguire, Inc., HCMM,

Inc., Patrick Maguire, David Pineda, Robert Popkey, William Shapcott, John Morris, and

Huntington Copper, LLC, alleging violations of Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e *et seq*., the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101 *et seq*., the

Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*., and the Equal Pay Act ("EPA"), 29

U.S.C. § 206(d).  Doc. 1.  Egan voluntarily dismissed her claims against Shapcott.  Doc. 27

(Conlon, J.).  After the suit was reassigned to the undersigned judge's calendar, Doc. 44, the

court dismissed the claims against Pineda for lack of personal jurisdiction, Docs. 85-86 (reported

at 2014 WL 585316 (N.D. Ill. Feb. 14, 2014)), and Egan voluntarily dismissed her claims against

Morris and Huntington Copper Moody & Maguire, Docs. 118, 121-122.  Now before the court

are separate motions by Patrick Maguire and HCMM for summary judgment.  Docs. 130, 132.

The motions are granted.

## Background

The facts are set forth as favorably to Egan as the record and Local Rule 56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). On summary judgment, the court must assume the truth of those facts, but does not vouch for them. *See Smith v. Bray*, 681 F.3d 888, 892 (7th Cir. 2012).

Patrick Maguire ("Patrick") founded Huntington Copper Moody & Maguire, a management consultant firm, and served as its sole shareholder from 2002 to 2010. Doc. 147 at ¶¶ 11, 15; Doc. 148-1 at ¶¶ 11, 15. (In violation of Local Rule 56.1(b)(3), Egan did not re-state Defendants' Local Rule 56.1(a)(3) assertions in her Local Rule 56.1(b)(3)(B) response, so this opinion cites both the Local Rule 56.1(a)(3) statement and Local Rule 56.1(b)(3)(B) response.) Julie Maguire ("Julie"), Patrick's wife, worked at the firm in an administrative position beginning in 2006. Doc. 147 at ¶ 13; Doc. 148-1 at ¶ 13.

Due to his poor health, Patrick decided in March 2010 to sell the company to Pineda, Popkey, and RDR Consulting, LLC, via an asset sale. Patrick was retained as a consultant during the pendency of the transaction to advise Popkey and Pineda. Doc. 147 at ¶¶ 22-25; Doc. 148-1 at ¶¶ 22-25. The sale closed on July 15, 2010; that same day, RDR Consulting changed its name to Huntington Copper, LLC. Doc. 147 at ¶¶ 28-29; Doc. 148-1 at ¶¶ 28-29. After the close, Patrick stayed on as a consultant for the purpose of keeping his health benefits, but did no consulting or other work for the new company. Doc. 147 at ¶¶ 27, 33; Doc. 148-1 at ¶¶ 27, 33.[*]

---

[*] Egan asserts that the new owners employed Patrick, paid him, and provided him with health benefits through February 2012, but that is not inconsistent with Patrick's assertion in ¶ 27 of his Local Rule 56.1(a)(3) statement that he stayed on solely to receive health benefits without providing work. Doc. 147 at ¶ 27; Doc. 148-1 at ¶ 27. Egan denies Patrick's assertion in ¶ 33 that he provided no consulting services for Huntington Copper after ownership was transferred, maintaining that he "continuously attempted to exert influence over Huntington Copper, LLC, despite his actions being against the company's management." Doc. 148-1 at ¶ 33. But the only evidence Egan cites to support her submission are two November 2011 emails sent by Patrick to

Julie continued working for Huntington Copper as director of operations, but her role was limited to making travel arrangements and forwarding emails for the company's owners. Doc. 147 at ¶ 34; Doc. 148-1 at ¶ 34.

Egan began working at Huntington Copper on February 7, 2011. Doc. 147 at ¶ 37; Doc. 148-1 at ¶ 37. During Egan's tenure as a Regional Vice President ("RVP"), a Huntington Copper training supervisor made comments about her weight that led her to resign from the company. Doc. 147 at ¶¶ 44, 47-55; Doc. 148-1 at ¶¶ 44, 47-55. Egan claims that Huntington Copper's male RVPs received better sales leads, more opportunities, and higher pay than its female RVPs. Doc. 147 at ¶¶ 79, 92, 96-97; Doc. 148-1 ¶¶ 79, 92, 96-97, 106. Egan announced her resignation in an email to Pineda and Popkey on August 18, 2011. Doc. 147 at ¶ 55; Doc. 148-1 at ¶ 55.

In November 2011, Popkey fired half of Huntington Copper's staff, including Julie and Pineda. Doc. 147 at ¶ 58; Doc. 148-1 at ¶ 58. Huntington Copper also defaulted on a promissory note it had made to Patrick as part of the sale. Doc. 147 at ¶ 59; Doc. 148-1 at ¶ 59. Patrick sued Huntington Copper, Popkey, and Pineda in Ohio state court for defaulting on the note. Doc. 147 at ¶ 60; Doc. 148-1 at ¶ 60. Popkey later filed for bankruptcy and received a discharge of his pre-petition debts. Doc. 147 at ¶¶ 63-64; Doc. 148-1 at ¶¶ 63-64; Doc. 65-2.

On November 9, 2011, about a week after she was terminated by Huntington Copper, Julie founded HCMM; she is its sole shareholder and president. Doc. 147 at ¶¶ 65-66; Doc. 148-1 at ¶¶ 65-66. Julie chose the name "HCMM" to build on Patrick's and Huntington Copper Moody & Maguire's reputations. Doc. 147 at ¶ 67; Doc. 148-1 at ¶ 67. To this end, HCMM

---

Huntington Copper's employees about the judgment he received against Huntington Copper, Popkey, and Pineda in Ohio state court due to their failure to pay him as required by the asset purchase agreement. Doc. 127 at 42-54. That hardly qualifies as doing work or performing services for Huntington Copper.

"held itself out to the public not as a new corporation, but a 'rebirth' of Huntington Copper Moody Maguire." Doc. 150 at ¶ 111. In February 2012—the Local Rule 56.1(a)(3) statement says 2011, but that must be a typo—an Ohio court entered an agreed order stating that "HCMM shall be permitted to compete against Huntington Copper and can use the name 'HCMM, Inc.,' 'HCMM,' and 'Huntington Copper Moody and Maguire,' but it is not permitted to use the name 'Huntington Copper' or 'Huntington Copper LLC.' Further, HCMM, Inc., shall have the right to use the web names corresponding to the name (HCMM, Inc.) and acronym (HCMM)." Doc. 147 at ¶ 61; Doc. 148-1 at ¶ 61 (some internal quotation marks added). HCMM also sought to use Huntington Copper Moody & Maguire's historical data for its Better Business Bureau ("BBB") business review, while at the same time distancing itself from Huntington Copper. Doc. 147 at ¶ 76; Doc. 148-1 at ¶ 76. HCMM's BBB review states that the company originated on October 21, 2002, and explains that "[i]n April 2010, assets of [Huntington Copper Moody & Maguire] were sold to two employees. Those employees operated the business under the name Huntington Copper. In November 2011, the original owners resumed operations under the name HCMM. A separate business review on Huntington Copper is available." Doc. 150 at ¶¶ 113; Doc. 148-7 at 2-4.

HCMM initially asserted in its Local Rule 56.1(a)(3) statement that it did not acquire any assets from Huntington Copper except for a telephone system and some furniture, which it purchased from Huntington Copper's landlord two months after Huntington Copper was evicted. Doc. 147 at ¶ 75. Egan denied this assertion, maintaining that HCMM also briefly used Huntington Copper's and Huntington Copper Moody Maguire's telemarketing software, called "SPEED." Doc. 148-1 at ¶ 75. Egan cites an email from Patrick stating that Popkey owed SPEED's vendor "a ton of money" and that even "if we could get him to release the software," it

4

would require a "$75,000 re-write."  Doc. 127 at 257.  Patrick's email continued: "Julie is using

a piece of the SPEED program that only does a little of what SPEED does.  So given that SPEED

is no longer a viable option, Julie is having a brand new telemarketing system built from

scratch."  *Id*. at 258 (emphasis added).  Although the meaning of this email is unclear, HCMM's

reply brief HCMM concedes that the email shows that HCMM purchased at least some software

from Huntington Copper.  Doc. 152 at 9 ("HCMM, Inc. did not purchase Huntington Copper,

LLC's assets (except for a telephone system, a 'piece of the SPEED [telemarketing] program,'

and some furniture from Huntington Copper, LLC's landlord).") (alteration in original).  There is

no dispute that HCMM ultimately decided not to use SPEED and created its own telemarketing

software from scratch.  Doc. 147 at ¶ 69; Doc. 148-1 at ¶ 69.

Although HCMM initially had only two employees, it has since hired many former

Huntington Copper employees.  Doc. 147 at ¶¶ 70-71; Doc. 148-1 at ¶¶ 70-71.  HCMM did not

hire any of Huntington Copper's management personnel, however, and it operates out of a

different facility.  Doc. 147 at ¶¶ 68, 73; Doc. 148-1 at ¶¶ 68, 73.  HCMM markets itself through

client testimonial videos on its website, but none of the videos depict former clients of

Huntington Copper.  Doc. 147 at ¶ 78; Doc. 148-1 at ¶ 78.

## Discussion

## I.      Claims Against Patrick Maguire

### A.      Title VII Claim

Patrick contends that the Title VII claim against him fails because Title VII imposes

liability only against "employers" and he is not an employer within the meaning of the statute.

Doc. 132 at 5-7.  Egan concedes the point, Doc. 149 at 2 n.1, so Patrick is granted summary

judgment on the Title VII claim.

### B. IHRA Claim

Patrick seeks summary judgment on Egan's IHRA claim on the ground that Egan did not comply with the IHRA's exhaustion requirements. Doc. 132 at 7-9. The IHRA sets forth in 775 ILCS 5/7A-102 the procedures for filing a charge with the Illinois Department of Human Rights ("IDHR"). Failure to comply with the IHRA's exhaustion requirements warrants dismissal of an IHRA claim. *See Garcia v. Vill. of Mt. Prospect*, 360 F.3d 630, 640 (7th Cir. 2004); *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 459 (7th Cir. 1994); *O'Connell v. Cont'l Elec. Constr. Co.*, 2011 WL 4916464, at *12 (N.D. Ill. Oct. 17, 2011).

Egan's complaint attaches only a copy of her EEOC right to sue letter. Doc 1-1. But "a right to sue letter from the EEOC does not serve as a substitute for a final order from the IDHR." *Anderson v. Ctrs. for New Horizons, Inc.*, 891 F. Supp. 2d 956, 960 (N.D. Ill. 2012) (quoting *Jiminez v. Thompson Steel Co.*, 264 F. Supp. 2d 693, 695 (N.D. Ill. 2003)). Moreover, Egan never maintains that she received a final order from the IDHR, that she complied with the IHRA's other procedures, or that her EEOC right to sue letter should suffice. She argues only that "equitable reasons exist for permitting [her] IHRA claims." Doc. 149 at 4. However, she does not cite any authority to support an equitable exception to the IHRA's exhaustion requirement, and nor does she explain what these "equitable reasons" are. Her argument, in its entirety, reads:

> [Egan] initially filed with the EEOC in California and received a Notice of Right to Sue from the California Department of Fair Employment and Housing. However, her EEOC complaint was transferred to several different places and, ultimately, she received the Notice of Right to Sue from the EEOC's Cincinnati Local Office. Thus, [sic]
>
> Accordingly, it is respectfully submitted that Mr. Maguire's motion is denied in this respect as well.

*Id*. at 4-5.  By failing to provide any legal or factual support for her argument, Egan has forfeited

the point.  *See Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 386 (7th Cir. 2012); *Alioto v.*

*Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011); *Humphries v. CBOCS W., Inc.*, 474 F.3d

387, 407 (7th Cir. 2007) ("We agree with the district court's determination that [the plaintiff]

waived (forfeited would be the better term) his discrimination claim by devoting only a skeletal

argument in response to [the defendant's] motion for summary judgment."), *aff'd*, 553 U.S. 442

(2008).  Patrick is therefore granted summary judgment on the IHRA claim.

### C.     EPA and FLSA Claims

The FLSA defines the term "employer" to include "any person acting directly or

indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  The

same definition of "employer" applies under the EPA.  *See Riordan v. Kempiners*, 831 F.2d 690,

694 (7th Cir. 1987).  "The word 'employer' is defined broadly enough in the [FLSA] (of which

the [EPA] is an amendment) to permit naming another employee rather than the employer as

defendant, provided the defendant had supervisory authority over the complaining employee and

was responsible in whole or part for the alleged violation."  *Ibid*.; *see also Luder v. Endicott*, 253

F.3d 1020, 1022 (7th Cir. 2001) ("the supervisor who uses his authority over the employees

whom he supervises to violate their rights under the FLSA is liable for the violation").

Patrick contends that he is not an employer under the FLSA or the EPA and therefore that

he cannot be held liable for alleged violations of those statutes.  Doc. 132 at 10-11.  It is

undisputed that Patrick never exercised supervisory authority over Egan, the complaining

employee.  As discussed above, after he sold the assets of Huntington Copper Moody & Maguire

to Pineda and Popkey, Patrick was retained as a consultant to keep his health benefits and did no

consulting or other work.  So even though Patrick formally "stayed employed in some fashion

through February 2012," Doc. 148-1 at ¶ 27, that does nothing to show that he had *supervisory authority* over *Egan*. Indeed, Egan never asserts, in either her Local Rule 56.1(b)(3)(B) response or her Local Rule 56.1(b)(3)(C) statement of additional facts, that Patrick exercised any authority over Egan whatsoever. Without exercising such authority, Patrick cannot be liable to Egan under the FLSA or the EPA. *See Riordan*, 831 F.2d at 694; *Irizarry v. Catsimatidis*, 722 F.3d 99, 109 (2d Cir. 2013) ("to be an 'employer' [under the FLSA], an individual defendant must possess control over a company's actual 'operations' in a manner that relates to a plaintiff's employment").

## II.     Claims Against HCMM

HCMM seeks summary judgment on the ground that it was not Egan's employer and that there is no basis for successor liability. Doc. 130 at 6-8. In her response, Egan does not contend that HCMM was her employer, but she does argue for successor liability, maintaining that HCMM is liable for Huntington Copper's misconduct. Doc. 148 at 4-9. Successor liability in federal employment law cases turns on these factors: "(1) whether the successor had notice of the pending lawsuit; (2) whether the predecessor could have provided the relief sought *before* the sale or dissolution; (3) whether the predecessor could have provided relief *after* the sale or dissolution; (4) whether the successor can provide the relief sought; and (5) whether there is continuity between the operations and work force of the predecessor and successor." *EEOC v. N. Star Hospitality, Inc.*, 777 F.3d 898, 902 (7th Cir. 2015).

The successor liability theory is poorly suited to this case. The Seventh Circuit has explained that "[w]hen a company is sold in an asset sale …, the buyer acquires the company's assets but not necessarily its liabilities; whether or not it acquires them is the issue of successor liability." *Teed v. Thomas & Betts Power Sol'ns, LLC*, 711 F.3d 763, 764 (7th Cir. 2013). This

suggests that there can be no successor liability without a sale of substantial assets from the alleged predecessor to the alleged successor. Indeed, *Teed* stated that if a company's assets are "sold piecemeal there is no successor liability, because of the lack of continuity between predecessor and successor; for when a company is broken up and its assets sold piecemeal, there is no successor to transfer the company's liability to." 711 F.3d at 768; *see also New York v. Nat'l Servs. Indus., Inc.*, 352 F.3d 682, 694 (2d Cir. 2003) (Leval, J., concurring) (noting that an unpredictable successor liability rule might cause "[a]sset purchasers [to] favor piecemeal purchases at breakup value, in preference to purchasing at going-business value to continue the operation"). This poses a serious problem for Egan, since the record shows that HCMM purchased, at most, telephone equipment and some furniture from Huntington Copper's landlord and a "piece" of the SPEED telemarketing system, which it later discarded in favor of its own software from Huntington Copper.

*Teed*'s observation about piecemeal asset sales was dicta, however, and the Seventh Circuit has since upheld a finding of successor liability even though neither successor purchased more than piecemeal assets from the predecessor. *See Sullivan v. Running Waters Irrigation, Inc.*, 739 F.3d 354, 358 (7th Cir. 2014) ("Viewed in isolation, these assertions [that RWI acquired no assets and JV only piecemeal assets from Alpine] might be persuasive. However, these are artificial distinctions, which do not mask the substantial interrelatedness of RWI, JV, and Alpine."). Furthermore, so far as the court is aware, the only court of appeals to have squarely addressed the question concluded that "merger or transfer of assets is *not* a precondition to successor liability in the labor law (or Title VII) context," although whether or not such a transfer took place is still a factor in the analysis. *Cobb v. Contract Transp., Inc.*, 452 F.3d 543, 554-56 (6th Cir. 2006) (emphasis added). Accordingly, the court will not dispose of Egan's

successor liability claims against HCMM solely on the ground that HCMM purchased very few
of Huntington Copper's assets.

All this is academic, because even if successor liability were available in principle
following a piecemeal asset purchase, Egan still has not shown that such liability is appropriate
here.  The first factor in the successor liability analysis is whether HCMM had notice of Egan's
pending lawsuit.  *See N. Star Hospitality*, 777 F.3d at 902.  Egan asserts that HCMM did have
notice, but none of her reasons hold water.  First, she argues that she disclosed the alleged
discrimination in her California unemployment benefits application, which was granted on
October 28, 2011, with a copy of the decision sent to Huntington Copper.  Second, she maintains
that she "made frequent complaints" to Morris, Pineda, and Popkey regarding what she thought
were unfair employment practices.  Third, she notes that she filed her EEOC charge before
HCMM was formed.  Fourth, she contends that Patrick was aware in July 2010 that Huntington
Copper employees were upset with Morris, Pineda, and Popkey, and that Patrick was still
employed by Huntington Copper during the time that she was complaining about discriminatory
conduct.  Finally, Egan argues that when Julie was Huntington Copper's Director of Operations,
she sent out emails on behalf of Pineda and Popkey and had access to sales numbers that
demonstrated an income disparity between male and female RVPs.  Doc. 148 at 7-8.

Even after drawing all reasonable inferences in Egan's favor, none of this shows that
Julie or any other HCMM employee had notice of Egan's claim.  Arguments about what Morris,
Pineda, or Popkey knew are irrelevant to what HCMM knew, because they never worked for
HCMM.  Whether Patrick knew that employees at Huntington Copper were upset with new
management seven months before Egan was hired is also irrelevant.  What *Julie* knew is
relevant, but Egan has not adduced a genuine issue of fact regarding Julie's knowledge.  The fact

that Julie sent an email—from her own email account, Doc. 130-9 at 22—on behalf of Pineda and Popkey does not show that she was aware of complaints that Egan sent to them. Nor does the fact that Julie had access to summary sales numbers show that she should have known about the alleged sex discrimination in the assignment of sales opportunities.

Assuming that HCMM did have notice of Egan's claim, moreover, would not necessarily cut in favor of successor liability. Normally, "[w]here the successor has notice of a predecessor's liability, there is a presumption in favor of finding successor liability." *N. Star Hospitality*, 777 F.3d at 902. The Seventh Circuit has explained that "[t]he basis of the notice requirement is that the successor has some time to negotiate a change in the purchase agreement to reflect the potential liability of a lawsuit." *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 752 (7th Cir. 1985); *see also Teed*, 711 F.3d at 766-67 ("The successor will have been compensated for bearing the liabilities by paying less for the assets it's buying; it will have paid less because the net value of the assets will have been diminished by the associated liabilities."); *EEOC v. Vucitech*, 842 F.2d 936, 945 (7th Cir. 1988) ("The successor, if he knows of his potential liability, will demand compensation in the form of a lower price for the assets, and in this way the burden of liability will be shifted back to the owners of those assets, where it belongs."). As just discussed, however, HCMM purchased (at most) only scattered assets from Huntington Copper, the most substantial of which—the "piece" of the SPEED telemarketing program—it abandoned shortly thereafter because of concerns over cost and functionality. Because such minimal purchases do not ordinarily give rise to successor liability, *see Teed*, 711 F.3d at 764, HCMM would have had no reason to negotiate an offset in the purchase price for SPEED— assuming there was a purchase price to begin with. So the first factor points against successor liability, because HCMM had no notice; and even if Egan were right about Julie's awareness of

Egan's claims, the factor would only weakly support liability under the particular circumstances of this case.

The second through fourth successor liability factors—whether the predecessor could have provided the relief sought before its sale or dissolution, whether the predecessor could have provided the relief sought after its sale or dissolution, and whether the successor can provide the relief sought, *see N. Star Hospitality*, 777 F.3d at 902—do not strongly point in either direction. Huntington Copper defaulted on its promissory note to Patrick shortly after Julie formed HCMM and a few months after Egan resigned from the company. Popkey also later filed for Chapter 7 bankruptcy. As a result, it is unlikely that Huntington Copper could have provided monetary relief to Egan before its dissolution. This "counts against successor liability by making such liability seem a windfall to plaintiffs." *Teed*, 711 F.3d at 765. On the other hand, because the company has ceased doing business, it is also unclear how Huntington Copper could presently provide financial relief. This "favors successor liability, as without it the plaintiff['s] claim is worthless." *Id*. at 766. As for whether the purported successor, HCMM, can provide relief, that is a "goes without saying condition, not usually mentioned." *Ibid*. Unsurprisingly, it sheds no light on the proper outcome here.

The last factor is continuity of operations between Huntington Copper and HCMM. Continuity of operations is itself an "amalgamation" of several subsidiary factors: "(1) whether the new employer uses the same plant; (2) whether he uses the same or substantially the same work force; (3) whether he uses the same or substantially the same supervisory personnel; (4) whether the same jobs exist under substantially the same working conditions; (5) whether he uses the same machinery, equipment, and methods of production; and (6) whether he produces the same product." *Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1236 n.7 (7th Cir. 1986) (quoting

*EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1094 (6th Cir. 1974)) (internal quotation marks omitted).  Again, those subsidiary factors together point both ways.  Members of HCMM's staff previously worked for Huntington Copper and the two firms engaged in essentially the same type of business, but HCMM does not employ any of that company's former management or supervisory personnel and took steps to distance itself from Huntington Copper in its BBB and marketing materials.  Nor did HCMM use Huntington Copper's machinery, equipment, or methods of production, unless once counts the "piece" of the SPEED program that HCMM ultimately rejected.  HCMM concededly held itself out as a "rebirth" of an old company, but that company was the original Huntington Copper Moody & Maguire, for which Egan never worked and which Patrick sold to Pineda and Popkey six months before Egan was even hired.

Consideration of these factors leads to the conclusion that there is no justification for imposing successor liability on HCMM for Huntington Copper's alleged misdeeds.  A comparison with *EEOC v. Vucitech*, *supra*, makes this clear.  In *Vucitech*, the EEOC charged that the defendants (the "Vucitech group") negotiated a discriminatory collective bargaining agreement and then postponed formal action until the Supreme Court decided a related discrimination case.  While the EEOC charge was pending, the Vucitech group sold their stake in the business to a third party, Muzzamil Niazi, who proceeded to defraud and mismanage the company.  Two years later, the Vucitech group came out of retirement and purchased the company's assets at a public auction.  842 F.2d at 938-39.  In addition to the employees covered by the EEOC's original charge against the Vucitech group, a handful of employees were denied benefits under the same policy during Niazi's tenure.  *Id*. at 944.  The Seventh Circuit had "little doubt" that the Vucitech group could be held liable for the discrimination against those other employees according to principles of successor liability:

> Although the particular discrimination in question occurred after the Vucitech group had temporarily departed from the scene, it was merely a continuation of the baby bonus policy which the group had adopted and, as it were, bequeathed to its successor, Niazi. The collective bargaining agreement that the group negotiated in 1982 and that contained the $1,000 baby bonus did not expire until February 1985. By that time the group was back in control, and knew or should have known that the original charges of sex discrimination had not been resolved—and upon inquiry of the EEOC about their status would quickly have learned that two additional charges had been filed …. In addition, the Vucitech group was at least somewhat implicated in Niazi's violations of the Pregnancy Discrimination Act, which were pursuant to the collective bargaining agreement that the group had negotiated in 1982.

*Id*. at 945. *Vucitech* is nothing like this case. Here, the summary judgment record shows that neither Julie nor Patrick adopted any discriminatory policies to "bequeath" to Patrick's successors at Huntington Copper; that Julie did not take back control of her husband's business by purchasing its assets, but instead started a new company of her own; and that neither Julie nor any of HCMM's staff were personally implicated in any respect in the alleged discrimination against Egan.

One last point: the Seventh Circuit recognized in *Vucitech* that "[t]he disappearance of the tortfeasor (the predecessor in liability) before the succession" cut against successor liability by "reduc[ing] the likelihood that the succession was a device for escaping the consequences of liability." *Id*. at 946. Similarly, here there is absolutely no reason to believe that Julie formed HCMM to weasel out of the consequences of Huntington Copper's alleged liability to Egan. Putting aside the fact that Julie did not even know about Egan's claims, Julie's reasons for starting HCMM had nothing to do with the alleged discrimination against Egan. Julie started HCMM because she had been *fired* from Huntington Copper—by the very same people who supposedly discriminated against Egan in the first place. It would be downright bizarre to hold liable a new business (HCMM) started by somebody (Julie) after she was terminated by her former employer (Huntington Copper) on the ground that the former employer happened to

discriminate against a different employee (Egan). "[S]uccessor liability is appropriate in suits to enforce federal labor or employment laws … unless there are good reasons to withhold such liability." *Teed*, 711 F.3d at 766. These particular circumstances provide a *very* good reason why successor liability would be entirely inappropriate in this case.

### Conclusion

For the foregoing reasons, Patrick Maguire's and HCMM's summary judgment motions are granted. That leaves only two remaining defendants: Popkey and Huntington Copper. Rule 55(a) defaults were entered very early in the case against those two defendants. Docs. 12, 18 (Conlon, J.). Egan later sought, Doc. 28, and obtained, Doc. 33 (Conlon, J.), a redundant Rule 55(a) default against those defendants. Egan then moved under Rule 55(b) for a default judgment against those defendants as well as against HCMM and Patrick, Doc. 34; the court denied that motion because, as detailed on the record, Egan's counsel had dealt in far less than a forthright manner with HCMM and Patrick, Doc. 54. Although Popkey and Huntington Copper never appeared, Egan never renewed her Rule 55(b) default judgment motion against them. It appearing that Egan has lost interest in seeking relief against those defendants, the court will dismiss with prejudice the claims against them for want of prosecution. If the court is mistaken in this regard and Egan indeed wishes to pursue her claims against Popkey (who, Egan should remember, received a bankruptcy discharge of her pre-petition debts, though no suggestion of bankruptcy was ever filed) and Huntington Copper, she has until April 7, 2015, to file a motion to reinstate those claims.

March 24, 2015

_____
United States District Judge