UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JULIA EGAN, | ) | |
| | ) | |
| Plaintiff, | ) | 12 C 9034 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| HUNTINGTON COPPER MOODY & MAGUIRE, INC., | ) | |
| HCMM, INC., PATRICK MAGUIRE, DAVID PINEDA, | ) | |
| ROBERT POPKEY, WILLIAM SHAPCOTT, JOHN | ) | |
| MORRIS, and HUNTINGTON COPPER, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Julia Egan brought this suit against David Pineda and others, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Illinois Human Rights Act, 775 ILCS 5/1-101 *et seq.*, the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, and the Equal Pay Act, 29 U.S.C. § 206(d). Doc. 1. The court dismissed Egan's claims against Pineda for lack of personal jurisdiction, Docs. 85-86 (reported at 2014 WL 585316 (N.D. Ill. Feb. 14, 2014)), and very recently granted summary judgment to the defendants that remained, Docs. 162-163 (reported at 2015 WL 1396187 (N.D. Ill. Mar. 24, 2015)), and entered final judgment, Doc. 164. One loose end remains, Pineda's motion for sanctions against Egan and her attorney, Lewis G. Spicer of the Levine & Blit firm in New York. Doc. 98.

The complaint's seventy-fifth paragraph alleges that Egan "was repeatedly caused to be subjected to unwelcome verbal and *physical actions* of a sexual nature *and was further victimized by acts of sexual assault by the defendants' male employees in her work environment* throughout her employment tenure with defendants." Doc. 1 at ¶ 75 (emphases added). At her

1

January 2014 deposition, however, when questioned by Pineda, who was *pro se*, Egan denied that she had ever been sexually assaulted by her male co-workers, and denied further that she had ever told Spicer that any such assault(s) had occurred:

> Q. Page 12, No. 75. The statement "caused to be subjected to unwelcome verbal and victimized by acts of sexual assault" –
>
> A. I don't remember reading that in the Complaint.
>
> Q. Whether you read it isn't the question. It's that you wrote it.
>
> A. I actually didn't write that No. 75.
>
> Q. Do you have it in front of you?
>
> A. Yes.
>
> Q. Can you read No. 75, please?
>
> A. Sure. (Reading): Pursuant to the acts and practices of the defendants, its employees and/or agents, as alleged above, the plaintiff was repeatedly caused to be subjected to unwelcome verbal and physical actions of a sexual nature and was further victimized by acts of sexual assault by the defendants' male employees in her work environment throughout her employment tenure with defendants.
>
> I was not subject to any sexual assault, and I did not write that.
>
> MR. SPICER: Can we go off the record for one moment?
>
> MR. ALLEN: No.
>
> MR. SPICER: No.
>
> Q. Why did you write it if it's not true? Are you saying it's not true?
>
> A. I'm saying that I had verbal and – I wouldn't say physical actions, but verbal actions of a nature as disclosed in all the other documents in the binder that I submitted which did include victimization based on my weight and gender, but there was no sexual – sexual assault.
>
> Q. Why did you write it?
>
> A. I didn't write that.
>
> Q. This is your Complaint.

> A. I didn't sign this Complaint.
>
> Q. The defendants, including myself, we're husbands. We're dads. We're brothers. This is in writing and on the record that we are being accused of sexual assault. It is your Complaint, and today you're saying that you're not aware of it?
>
> A. With the documents when I got complaints – the Complaint to review, I did not see that, and I did not agree to that, and I did not write that. And in all the other supporting documents I have never once said that because I realize everyone has children and lives, and I understand that.

Doc. 90-2 at 10.

Pineda first brought this issue to the court's attention on February 4, 2014, in a motion to compel Egan to sit for an additional deposition. Doc. 83. Ten days later, the court granted Pineda's earlier-filed motion to dismiss for lack of personal jurisdiction, and therefore denied as moot his motion to compel. Doc. 85. In so ruling, however, the court indicated that the sexual assault allegation was a "concern" and informed Spicer that he should be prepared to address it at the next status hearing. Doc. 87.

At that hearing, the court, allowing that "sometimes complaints turn out not to be correct," asked Spicer to explain why the sexual assault allegation appeared in the complaint "given the seriousness of an allegation of sexual assault, which is an extremely serious crime, and the fact that it was put in a public document, and then the plaintiff says she never was subjected to sexual assault." This colloquy ensued:

> MR. SPICER: … Judge, it was an error in the complaint, and I have contacted the other parties who are still within the action to discuss a resolution of it. My suggestion is perhaps all parties consent, we file an amended complaint that simply removes that allegation. Because it is – it's acknowledged that it is a serious allegation, and it was an error.
>
> THE COURT: And how did that error occur?
>
> MR. SPICER: I'm not sure I follow, Judge.

3

> THE COURT: … How did an allegation of sexual assault get in a complaint where the plaintiff does not believe that she was subjected to a sexual assault?
>
> MR. SPICER: Judge, as I said, it simply – it was not supposed to be in there, and the complaint does deal with sexual harassment, gender discrimination. It was an oversight on our part that I certainly would simply like to have removed.

2/19/2014 Tr. at 10-11.

Shortly thereafter, Pineda moved for sanctions. Doc. 98. Spicer included with his response an affidavit terming the sexual assault allegation "an error included in one paragraph of the complaint," but he failed, despite the court's questions at the hearing, to explain *how* the error occurred. Doc. 112 at ¶ 9. At the next status hearing, the court gave Spicer yet another opportunity to explain himself:

> THE COURT: So, finally, we have David Pineda's motion for sanctions, which has been fully briefed. I'm not ready to rule on it because I have an open question for Mr. Spicer.
>
> When we spoke about this last on the record, I asked how that allegation made it into the complaint, the allegation that the plaintiff was subjected to sexual assault in the workplace, which is a term that is a more modern – it's commonly associated with the older term, which is rape.
>
> …
>
> And I'm wondering, how did that mistake get made? What happened that allowed that allegation, which everybody now agrees was false, how did that allegation make its way into a complaint that you signed and filed?
>
> MR. SPICER: Judge, again, it's – I don't know what to tell you, other than it was an error and an oversight on my part. I apologize to the Court. I apologize to the other parties. It was a 130-some-odd page – or paragraph complaint, and it was a simple error in proofreading on my part.
>
> At no point did my client discuss anything that would indicate that sexual assault occurred, and I recognized the error. And I circulated a stipulation to all parties which I think has addressed the situation, and all parties except for Mr. Pineda have agreed to the language in the stipulation, which states essentially that it was an error. That allegation was never at issue in the complaint, and that paragraph is withdrawn.

> THE COURT: And I'm not asking you this out of just idle curiosity. It may be pertinent to the resolution of the motion. You said it was an error of proofreading. What were you trying to type that ended up saying sexual assault? Because that would be a proofreading mistake.
>
> MR. SPICER: Exactly. Judge, I would be – I mean, we're going back almost a year and three quarters now, to when this complaint was drafted. I believe going along lines of gender discrimination, there was harassing conduct that Ms. Egan was subject – verbally harassing conduct that Ms. Egan was subjected to by an employee of Huntington Copper.
>
> So again, it's a regrettable error. There were words that were said to my client which were awful. …
>
> And again, in trying to put together this complaint, it was simply an error that I did. It was not meant to be included. And our stipulation, I think, will rectify this situation.

4/22/2014 Tr. at 13-14.

None of these explanations are even remotely persuasive. Despite being given three opportunities, twice at status hearings and once in his response to the sanctions motion, Spicer was unable to explain *how* a demonstrably false sexual assault allegation found its way into a draft of the complaint—so that it could be overlooked during "proofreading"—in the first place. Taking into account the allegation's seriousness and Spicer's inability to explain how it could possibly have made its way into the complaint given Egan's denial that she had been sexually assaulted or had ever told Spicer that she had been sexually assaulted, the court finds Spicer's conduct highly unbecoming. The only real question is whether there is an appropriate vehicle to impose sanctions on him.

Pineda's sanctions motion invokes Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, and the court's inherent power. Doc. 98. Spicer correctly contends that Rule 11 is unavailable because Pineda filed his sanctions motion without complying with the safe harbor requirement of Rule 11(c)(2)—that is, without first serving a copy of the motion on Spicer and giving him 21 days to withdraw the paragraph. *See Matrix IV, Inc. v. Am. Nat. Bank & Tr. Co. of Chi.*, 649

F.3d 539, 552 (7th Cir. 2011) ("Rule 11(c)(2) provides that a motion for sanctions must be served on the opposing party, but that it cannot be filed with the court until 21 days have passed from the date of service of the motion."). Pineda argues that he substantially complied with the 21-day safe harbor because he filed his sanctions motion more than 21 days after serving Spicer with the motion to compel, which alerted Spicer to the false sexual assault allegation. Doc. 119 at ¶ 5; Doc. 120 at 2.

True enough, minor technical violations of the Rule 11 safe harbor requirement may be excused. For example, in *Nisenbaum v. Milwaukee County*, 333 F.3d 804 (7th Cir. 2003), where the party seeking sanctions sent the opposing party a "letter" or "demand" rather than a formal "motion," the Seventh Circuit held that the moving party, by "alert[ing]" the non-moving party "to the problem and g[iving] him more than 21 days to desist," had "complied substantially" with Rule 11 and was "entitled to a decision on the merits." *Id*. at 808. But because Pineda's motion to compel did not alert Spicer that Pineda would seek sanctions if the allegation were not withdrawn, the violation was not merely technical. And because a district court cannot impose Rule 11 sanctions by motion where the movant ignores the safe harbor, *see Divane v. Krull Elec. Co.*, 200 F.3d 1020, 1025 (7th Cir. 1999), Pineda cannot prevail under Rule 11.

Pineda's bid for sanctions under § 1927 faces two obstacles. The first concerns whether the statute, which permits the court to sanction an attorney who "multiplies the proceedings in any case unreasonably and vexatiously," 28 U.S.C. § 1927, can ever apply to an initial complaint. The First Circuit, pointing to an "unbroken band of cases across the courts of appeals," has answered that question in the negative, holding that "sanctions [are] not available under [§ 1927] for activity associated with the initial filing of a complaint." *Jensen v. Phillips Screw Co.*, 546 F.3d 59, 65 (1st Cir. 2008) (collecting cases). The Seventh Circuit has not

expressly weighed in on this issue. In *Bender v. Freed*, 436 F.3d 747 (7th Cir. 2006), the court held that, "[b]y its terms, § 1927 … applies … to misconduct by an attorney in the course of 'proceedings' in a 'case' before the court, not misconduct that occurs before the case appears on the federal court's docket." *Id*. at 751. This is consistent with *Jensen*, but arguably leaves open the possibility that actually filing a complaint is covered by § 1927. Other Seventh Circuit decisions could be read to imply that § 1927 applies to initial complaints, at least under certain circumstances. *See In re TCI Ltd.*, 769 F.2d 441, 447 (7th Cir. 1985) ("Rule 11 sets out a standard that we think applies equally to § 1927: a complaint must be 'warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law.'"); *Knorr Brake Corp. v. Harbill, Inc.*, 738 F.2d 223, 227 (7th Cir. 1984) ("before a court may assess fees under section 1927, the attorney must intentionally file or prosecute a claim that lacks a plausible legal or factual basis"); *cf. Ordower v. Feldman*, 826 F.2d 1569 (7th Cir. 1987) (affirming sanctions under both Rule 11 and § 1927 for serving a complaint well after the 120-day limit of the predecessor to Rule 4(m)). But the Seventh Circuit has never directly addressed the question.

In any event, even if § 1927 could apply to an initial complaint, the provision authorizes the court to award only "*excess* costs, expenses, and attorneys' fees reasonably incurred *because of* [the unreasonable and vexatious] conduct." 28 U.S.C. § 1927 (emphases added). This means that the statute allows recovery only for the marginal costs caused by the sanctionable conduct. *See Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 756 n.3 (1980) ("As the Court of Appeals pointed out, § 1927 provides only for *excess* costs caused by the plaintiffs' attorneys' vexatious behavior and consequent multiplication of the proceedings, and not for the total costs of the litigation.") (internal quotation marks omitted); *Pac. Dunlop Holdings, Inc. v. Barosh*, 22 F.3d

7

113, 120 (7th Cir. 1994) (reversing a district court's order of sanctions in part because "it is highly unlikely that much of the sanctions awarded represent 'excess' costs").

Pineda lists the following amounts "expended … as a direct result of the false and vexatious allegations against me":

- Postage         $84.00
- Copies          $27.00
- Air fare        $789.00
- Hotel           $193.22
- Meals           $157.41
- Legal fees      $11,700.00 (calculated by multiplying the number of hours he spent on the case (325) by the national average hourly rate for a paralegal ($36))

Doc. 98 at p. 6, ¶ 9. In *Kay v. Ehrler*, 499 U.S. 432, 435-36 (1991), the Supreme Court held that a *pro se* litigant cannot recover attorney fees under 42 U.S.C. § 1988, and in *Richlin Security Service Co. v. Chertoff*, 553 U.S. 571, 580 (2008), the Court held that paralegal fees are part of attorney fees under § 1988. Even setting aside whether the same holds true under § 1927, Pineda has failed to show how any of the listed costs were incurred "because of" the baseless sexual assault allegation. Paragraph 75 should not have been in the complaint, but neither was it critical to any of Egan's substantive claims. Had ¶ 75 been left out of the complaint, Pineda still would have incurred postage, copying, and travel expenses. In other words, Pineda has not shown that the inclusion of the sexual assault allegation caused him to incur any expenses that he would not otherwise have incurred in defending this case. He therefore cannot prevail under § 1927.[1]

---

[1] Pineda very briefly argues for sanctions on the ground that Egan was not fully prepared for her deposition and that Spicer made frivolous contentions in opposition to Pineda's motion to dismiss for lack of personal jurisdiction. Doc. 98 at p. 2, ¶¶ 4-5. Those arguments by Pineda are so perfunctory as to be forfeited. *See Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived") (internal quotation marks omitted). In any event, Pineda does not explain how those missteps by Egan and Spicer caused Pineda to incur any additional expenses. Even if Egan was not prepared for her deposition, Pineda did not have to take a second deposition because his personal jurisdiction motion was granted. And even if this case had been

That leaves the court's inherent authority. The Supreme Court has held that courts "ordinarily should rely on the Rules rather than the inherent power," but that "if in the informed discretion of the court, neither the statute [§ 1927] nor the Rules are up to the task, the court may safely rely on its inherent power." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991); *see Dal Pozzo v. Basic Mach. Co.*, 463 F.3d 609, 614 (7th Cir. 2006) ("the inherent power of the court is a residual authority, to be exercised sparingly and only when other rules do not provide sufficient basis for sanctions") (internal quotation marks omitted). Having held that neither Rule 11 nor § 1927 are up to the task, the court holds that sanctions under the inherent power are appropriate.

The inherent power permits a court to sanction attorneys "for actions taken in bad faith, vexatiously, wantonly, or for oppressive reasons." *Johnson v. Cherry*, 422 F.3d 540, 548-49 (7th Cir. 2005) (citing *Chambers*, 501 U.S. at 45-46). "Bad faith" or "vexatious" conduct, in both the inherent power and § 1927 contexts, does not require subjective bad intent; certain types of reckless conduct can suffice. *See Mach v. Will Cnty. Sheriff*, 580 F.3d 495, 501 (7th Cir. 2009) ("[c]ourts have used phrases such as … recklessly making a frivolous claim" to describe what constitutes "bad faith"); *Dal Pozzo*, 463 F.3d at 614 ("If a lawyer pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound, the conduct is objectively unreasonable and vexatious."); *Stive v. United States*, 366 F.3d 520, 522 (7th Cir. 2004) ("Recklessly making a frivolous claim is treated as bad faith within the meaning of the American rule"); *Kotsilieris v. Chalmers*, 966 F.2d 1181, 1185 (7th Cir. 1992) ("we have held that the bad faith standard has an objective component, and extremely negligent conduct,

---

filed in Ohio or California, where Egan worked and where her employer was located, Doc. 1 at ¶¶ 3, 5, 7, 22, 36, 42, Pineda, who lives in Florida, still would have incurred travel expenses in connection with deposing Egan in those States, and Pineda does not even attempt to show that those expenses would have been less than the expenses he incurred in traveling to Illinois to depose Egan.

like reckless and indifferent conduct, satisfies this standard"). However, the court may not use its inherent authority "to sanction attorneys for mere negligence." *Maynard v. Nygren*, 332 F.3d 462, 471 (7th Cir. 2003).

Spicer's unexplained inclusion of the sexual assault allegation in the complaint was far more than negligent and easily qualifies as reckless. The allegation transformed an already serious charge of sexual harassment into an extremely serious charge of sexual violence. Sexual assault—a term that encompasses the crime formerly known as rape, *see Lieberman v. Washington*, 128 F.3d 1085, 1087 n.1 (7th Cir. 1997)—used to be punishable by death, and remains among the most serious felonies.

It is true that Spicer agreed to a stipulation acknowledging that "Paragraph 75 of the Complaint contains an incorrect and untrue allegations regarding sexual assault that was included in the complaint in error" and stating that "Paragraph 75 is hereby withdrawn from the complaint." Doc. 138. But the damage had already been done. Pineda was accused in a public court filing of sexual assault. A Google search of "David Pineda" and "lawsuit"—something that any prospective employer or business partner might be expected to perform—turns up this court's prior opinions in this case. Those opinions, of course, reveal that the plaintiff is Julia Egan, and a Google search of "David Pineda" and "Julia Egan" turns up, on its first page, a website that offers a copy of the complaint for $6.99. *See* http://tinyurl.com/nvbespa (visited Apr. 10, 2015). By so recklessly and thoughtlessly slinging a patently baseless accusation of sexual assault, Spicer stained Pineda's reputation. Maybe this opinion—the stipulation's label, "Stipulation," gives no indication of its content and is highly unlikely to be opened by somebody who reads the complaint—could provide a partial corrective—only if somebody reading the complaint proceeds to search for and review the court's opinions to see if anything came of the

sexual assault allegation—but the bell has already been rung. *See ACLU v. U.S. Dep't of Justice*, 750 F.3d 927, 942 (D.C. Cir. 2014) (Brown, J., dissenting) ("Thanks to the Internet (for better or worse), information that was once scattered, localized, and forgotten with the passage of time is now effectively permanent and searchable. And though one might wish quietly to melt into the shadow of obscurity, the inexorable march of time is simply no match for the unflagging, unforgiving memory that is the World Wide Web.").

When a court exercises its inherent powers, "as in all cases[,] the punishment must fit the crime." *Diettrich v. Nw. Airlines, Inc.*, 168 F.3d 961, 964 (7th Cir. 1999). "Careful, case-specific consideration is owed therefore not only to the character of the sanctionable conduct, but also to the nature and purpose of the sanctions." *United States v. Johnson*, 327 F.3d 554, 562 (7th Cir. 2003). Considering the nature and circumstances of the sanctionable conduct, the court believes $5,000 is an appropriate sanction. *See United States v. King-Vassel*, 728 F.3d 707, 717-18 (7th Cir. 2013) (approving of monetary sanctions under the inherent power); *Carr v. Tillery*, 591 F.3d 909, 919 (7th Cir. 2010) ("A court has inherent power … to punish by an award of reasonable attorneys' fees or other monetary sanction … misconduct by lawyers appearing before it.").

The court does not lightly impose this sanction. If memory serves, this is the first sanctions motion that the undersigned judge has granted in his over four years on the bench. And if Spicer's misconduct had been just an aberrant slip in an otherwise admirable (though unsuccessful) representation, Pineda's sanctions motion might have presented a closer call. But Spicer's conduct as an attorney in this litigation has been distressing at several junctures. Three examples illustrate the point.

First, shortly after this case was reassigned to the undersigned judge, the court was presented with, among other things, a Rule 55(b) default judgment from Egan and motions to vacate a Rule 55(a) default from HCMM, Inc., and Patrick Maguire (together, "HCMM"). Docs. 31, 34, 43, 47. It turns out that Spicer had discussed with HCMM's attorney the possibility of Egan dismissing her claims against it, after which HCMM's attorney wrote a December 2012 letter to Spicer saying: "If you decide not to dismiss my clients, you will grant them two weeks to file an answer, or otherwise plead, from the date you inform us of your decision. If this letter is incorrect, please advise as soon as possible." Doc. 47-2 at 4. Yet in May 2013, Spicer asked the court to enter a Rule 55(a) default against HCCM, Doc. 28, opposed HCMM's motion to vacate any technical defaults against it, Doc. 36, and even submitted a personal declaration in support of his position, Doc. 37. At a hearing on July 3, 2013, the court asked Spicer whether he had ever informed HCMM's attorney that the attorney's December 2012 letter was incorrect, and Spicer answered "no," and also whether Spicer had ever advised the attorney that he would not dismiss the attorney's clients, to which Spicer again answered "no." When asked why he nonetheless sought to obtain a default judgment against HCMM, Spicer had no persuasive answer, other than to say he was representing his client, as if engaging in misleading-bordering-on-sharp practices that invariably will be brought to the court's attention is a sound or permissible litigation strategy.

Second, in opposing Pineda's motion to dismiss for lack of personal jurisdiction, Spicer advanced an absurd argument, which the court addressed as follows:

> In an effort to counter Pineda's evidence and support her submission that Pineda "resided in Illinois," Doc. 21 at 8, Egan frivolously argues that records obtained from the Cook County Recorder of Deeds show that "David Pineda" owns "four residential properties in Chicago, Illinois; one residential property in Oak Forest, Illinois; and one residential property in Lynwood, Illinois at various times throughout the last several decades, including the

12

> present." Doc. 21 at 5. Those records fall far short of qualifying as "affirmative evidence" that our David Pineda lived in Illinois. *Purdue Research Found.*, 338 F.3d at 783. The records show only that properties in Illinois are owned by one person or some people named "David Pineda." Doc. 29 at 5. "David Pineda" is not an uncommon name; a search of www.whitepages.com (visited Feb. 14, 2014) shows that several David Pinedas reside in Illinois and that several dozen live in the United States. Egan provides no basis whatsoever to conclude or even suspect that one of the David Pinedas (or the David Pineda) who owns property in Illinois is our David Pineda.

2014 WL 585316, at *2. It is true that Spicer's argument would have been worse if Pineda's name had been "John Smith." But as it was, the argument was awful.

Third, after the court dismissed Pineda and Pineda moved for sanctions, Spicer sought reconsideration of the dismissal order, arguing:

> … Jurisdiction is a waivable right, which a defendant can waive with express or implied consent. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985). Here, Mr. Pineda is affirmatively requesting that this Honorable Court award him monetary relief. This request comes several weeks after his motion to dismiss was granted. It follows that, as a result of his motion for sanctions, Pineda has availed himself of the Court and expressly submitted himself to its jurisdiction. As such, Pineda has expressed, through his actions subsequent to the Court's grant of dismissal, th[at] he impliedly consents to litigating in this Court. This fact did not exist prior to the Court's grant of dismissal to Pineda. Therefore, Plaintiff respectfully requests that the Court reconsider its determination concerning personal jurisdiction over Pineda now that he has expressed his consent to litigate in this Court.
>
> Accordingly, it is respectfully requested that because Mr. Pineda has clearly *and blatantly* availed himself of the jurisdiction of this Honorable Court, the Court reconsider its previous ruling granting Pineda's motion for dismissal.

Doc. 102 at 6-7 (emphasis added). Spicer cited no authority for the proposition that a defendant dismissed for lack of personal jurisdiction who then moves for sanctions on the ground that the opposing attorney had engaged in sanctionable conduct consents (blatantly!) to litigating in the improper forum. The proposition is self-evidently absurd. Spicer then closed his reconsideration motion by doubling down on his frivolous "this court has personal jurisdiction

over our David Pineda because there are properties in Illinois owned by a person or people named David Pineda" argument. *Id.* at 7-8.

So Spicer's conduct warrants sanctions under the court's inherent power, and this is not a situation where otherwise sanctionable conduct is an aberration that might for that reason have been excused. Accordingly, the motion for sanctions is granted. Attorney Lewis G. Spicer shall pay $5,000 to David Pineda by April 24, 2015.

April 10, 2015

United States District Judge